GUERNSEY, J., of the Third Appellate District, and DOYLE and STEVENS, JJ., of the Ninth Appellate District, sitting by designation in the Eighth Appellate District.

WILSON, JR., A MINOR, APPELLEE, *v.* THE EAST OHIO GAS CO., APPELLANT.

(No. 3398—Decided March 9, 1942.)

*Messrs. Hadley, Weaver & Vale,* for appellee.

*Messrs. Buckingham, Doolittle & Thomas,* for appellant.

WASHBURN, J. This is an appeal on questions of law. The appellee, a minor who brought this suit by next friend, will be referred to as the plaintiff, and the appellant, The East Ohio Gas Co., will be referred to as the gas company.

Plaintiff alleged that he was a pupil attending a public school in Barberton, held in a dwelling house upon the premises of the board of education, which was being used temporarily as a school house, and that the gas company supplied the building with "natural gas from its main situated in" a nearby street "by means of a 1¼-inch service pipe which ran from the curb in said street, back to the basement wall of said building."

The evidence disclosed that said service pipe was located about two feet below the ground, and, for a short distance, ran along a portion of the foundation wall of said building and some two or three feet therefrom, and then, by a right-angle turn, entered said building, where it connected with a meter belonging to said company.

The petition also alleged that in May, 1939, a contractor, acting for the board of education, constructed a sewer line on the property of the board of education, parallel and close to said service pipe, and that in doing so the contractor dug a ditch "in such a manner as to completely uncover the said pipe line," and that, after the line of sewer had been laid, the ditch "was again filled up with earth by the said contractor, covering up both the line of sewer and the said service gas line," and that "in so removing the earth from above and around the said service gas line; in laying the said line of sewer; and in replacing the earth over and

around the said sewer and the said gas line, the said contractor, through his employees, performed the said work so unskillfully and negligently as to cause, as a result thereof, the said service gas line, which consisted of a metal pipe, to become completely broken at a point at about five feet and six inches from the outside northwest corner of the foundation of the said building," and that "as a result of the said break in the said gas line pipe, gas furnished by defendant, escaped from the said pipe and filtered its way through the soil and into the said building * * *, and that on the 31st day of May, 1939, as a result of a fire being lighted in said building," the gas ignited and exploded, damaging the building and injuring plaintiff.

Several times in the petition said service pipe is referred to as "its" pipe, meaning the gas company's. If that could be construed as an allegation that the service pipe was owned and controlled by the gas company, there is no evidence in the record supporting such allegation. There is no allegation in the petition as to custom or a contract indicating any right in the gas company to control such service pipe or a right to in any manner interfere with the board of education in regard to how it should improve its property, or right to direct or control the contractor as to what he should do in reference to said service pipe, in building the sewer he was building; neither is there any allegation in the petition claiming that the service pipe was deteriorated or defective, and therefore unsafe.

All that is alleged in the petition as a basis for the gas company's liability is "that although the East Ohio Gas Company well knew, or in the exercise of ordinary care should have known, that the excavation work before-mentioned was in progress and that the earth above and around *its* said service line was to be moved, was being moved and had been moved, and that

the sewer line above-mentioned was to be laid, was being laid and had been laid, in close proximity to the said service line, it failed and neglected to properly inspect the *performance* of the said work so as to reasonably assure itself that the said work had been performed without injury to *its* said service line, or, if injury had been done, that the same had been repaired, as in the exercise of ordinary care under the circumstances, it could and should have done.'' (Italics ours.)

The petition further alleged that ''the failure of the said The East Ohio Gas Company to *inspect* the said work and assure itself that no injuries had been done to said pipe, or, if injury had been done, that the same had been repaired, was the direct and proximate cause of the injuries to plaintiff hereinafter set out.'' (Italics ours.)

The gas company answered admitting its incorporation, that it supplied natural gas to the board of education, that said contractor for the board of education was engaged in laying a sewer line, that the earth was removed from around the gas service line of the board of education of the city of Barberton, running to a building then owned by said board, that as a result thereof said service line became broken, permitting the escape of gas through said fracture, and that the explosion occurred and that the plaintiff was injured, and denying all other allegations of the petition.

At the trial the gas company objected to any testimony under the pleadings, which objection was overruled and exception noted, and at the conclusion of the evidence of plaintiff the gas company made a motion for a judgment in its favor, which motion was overruled and exception noted, and then the gas company rested without the introduction of any testimony and renewed its motion for a judgment, which motion was again overruled and an exception noted.

All of the evidence shown in the record was introduced by and vouched for by the plaintiff, and there is no dispute in the evidence as to the essential facts; and such conflict as there is as to inferences to be drawn from the facts is mostly as to minor and unimportant matters.

The record discloses that the board of education owned a tract of land consisting of contiguous lots in the city of Barberton, some of which lots had been recently purchased, and had on them dwelling houses and business buildings, to which the gas company and its predecessor had supplied gas for many years.

One of such buildings was a dwelling house, in the cellar of which the explosion which injured the plaintiff occurred. The service pipe through which gas was furnished to said building was the property of the board of education and was under its exclusive control; it connected with the pipes of the gas company in the street at the property line of the lot, and neither by custom nor by contract did the gas company have any right to do anything with said service pipe without the consent of the board of education, and the law conferred no right upon the gas company to do anything to said service pipe without the consent of the owner, except to shut off the gas in the street. There is no evidence in this case of any consent of any nature having been given by the board of education to the gas company, and there is no evidence of any notice given by the board of education to the gas company in reference to said service pipe or anything that was being done in connection therewith before said explosion occurred (such knowledge as the gas company had in reference to what was being done in the vicinity of said gas pipe will be hereinafter referred to).

In the spring of 1939, soon after acquiring this additional property, the board of education decided to

build a large building thereon, and to facilitate that purpose it decided to make temporary use of the dwelling house for school room purposes, and on Jan. 17th made written application to the gas company to turn on the gas and supply the premises with gas through the service pipe. Said gas company and its predecessor had furnished gas through said service pipe for more than 30 years, and there was no evidence indicating that the pipe had been replaced or repaired during that time.

To further facilitate the construction of the said large building, the board of education determined to change the course of a sewer on said tract of land and in the vicinity of said house, such change being entirely upon the property owned by the board of education; accordingly, a contract was made with one Perry, who will hereinafter be referred to as the contractor, to make such change.

The new location was along and within a few feet •f said building, and from a, point about six feet from the corner of the building the course of the sewer extended along and close to said gas service pipe to within six feet of the property line, and there turned at right angles away from the service pipe. The depth of the sewer was some feet below the bottom of the cellar of the building, and the soil where it was built was mostly sand, with some gravel, which for the most part was removed and a trench made by the use of a coal-burning clamshell shovel; and the sides of the trench were supported by sheeting driven in as work progressed, and braced apart by timbers.

The contractor began work on the 15th day of May, and by the 17th of May the sewer was laid and the trench substantially refilled, up to the point where the service pipe entered the building.

The location of the sewer was such that the side of

the trench at that point was within a few inches of and parallel with said service pipe, and, it being evident that the pipe would be uncovered and the soil beneath disturbed, the contractor widened the distance between the sheetings on each side of the trench so as to bring the pipe within the trench, and supported the pipe by a plank laid on cross-timbers installed for the purpose of keeping the sheeting on each side of the trench apart.

As the sewer was laid in the trench along said pipe, the trench was filled up to a level with the pipe, which was about 2 feet below the surface, and that operation was completed by the 20th of May, which was a Saturday; and on May 22nd that part of the sewer along the service pipe was completed by filling in the sewer by hand shoveling, and all of the sheeting and cross-beams were removed.

The contractor testified that on the 21st of May, which was a Sunday, and before the pipe was covered up, he inspected the same to discover whether any damage had been done to the pipe, or whether there was any leak of gas from the pipe, and he found that the pipe was sound and had not been damaged and that no gas was escaping; and there was no evidence by any witness of the smell of gas on the premises in the vicinity of the pipe or in the basement of the building while said improvement was being made, or thereafter until after the explosion.

The janitor testified that, before the sewer was constructed, he smelled gas in the basement, and that by direction of the custodian he turned off the gas where the pipe entered the basement and behind the meter, and that thereafter and up to the time of the explosion he did not smell gas in the basement or vicinity, although he was frequently in the basement, and, from time to time, burned waste paper in the furnace there-

in. After the gas had been so shut off in the basement, said custodian of the board of education was in the basement for the purpose of making sure that the gas had been turned off, and he smelled no gas at any time; the meter was read at 9:30 a. m. and on the day of the explosion, which occurred at 1:30 p. m., and the meter reader did not smell any gas; neither the contractor nor anyone in behalf of the board of education, or anyone else, made known to the gas company that the gas had been so shut off in the basement or that there had been a smell of gas before said sewer was laid, and no request or suggestion was made by anyone to the gas company about turning the gas off from the service pipe.

Between the completion of the sewer on May 22nd, and the explosion on May 31st, the soil in the trench along the service pipe settled more than in other places along the trench.

Within 15 minutes after the explosion the gas was turned off at the curb. Shortly thereafter an indicator test of the ground was made, which disclosed that in the sunken part of the trench near the corner of the building there was a 40% showing of gas, and that, for a radius of eight or ten feet from such point, there was gas in the ground but in diminishing quantity, and that, in a short distance beyond such radius, even in the trench, there was no gas.

Later, but soon after the explosion, said service pipe, in the presence of the contractor and representatives of the gas company and others, was uncovered, and, at the point where the test had shown the greatest density of gas, it was found that the gas pipe was completely broken in two, and that one end of the pipe where the break was, was lower than the other end by half the diameter of the pipe, and the edges of the break indi-

cated that the break had occurred very shortly before the explosion.

On May 31, when the explosion occurred, the janitor collected a quantity of waste paper, went to the basement, and put the same in the furnace and lighted it and partially closed the door of the furnace, and he did not detect any odor of gas. He went upstairs and collected another basket of waste paper, and, just as he started to go down the stairs into the basement, the explosion occurred in the cellar and wrecked the building and injured many of the pupils in attendance at the school.

As has been said, the gas company was not notified by anybody in reference to what transpired during the construction of said sewer, and it did not turn off the gas at the curb, made no inspection during the progress of the work, and knew nothing about said work except that, on May 15, just after the contractor had started the work, a representative of the gas company —the gas company having a gas main of its own in an alley where the work was begun, which was on the opposite side of said premises and about 150 feet from where the service pipe entered the premises—went to said alley where the gas company's pipe was located and where the contractor was digging a manhole, and inquired of the contractor whether, in his work, he would disturb the company's gas main in the alley; and the contractor told him that the improvement was to be made away from the alley in which he was then digging a manhole, and that, quoting the language of the contractor, "we were going to divert the sewer line and build it around the school property, and I showed him the location. * * * I showed him the east and west line of the sewer and the north and south line of the sewer" and "told Mr. Judge what we were there for, and what we were going to do, and where we were going to do it."

The record discloses that, at the time of such conversation, the contractor did not know of the existence of said service pipe, and that he did not discover that there was a service pipe parallel to where he was building the sewer until in the building of the sewer he reached the point where the service pipe entered the house, which was a distance of more than 100 feet from the point where he had begun construction of the sewer; and there is no evidence in the record that, at the time of said conversation, the representative of the gas company had knowledge of the location of the service pipe, and there is nothing in the record to justify the inference that either the representative or the contractor had in mind said service pipe of the board of education at the time of said conversation.

The trial of the case resulted in a judgment against the gas company; and while, in brief and argument, there are several claimed errors, we shall refer to only two : first, whether or not the court erred in submitting to the jury the question of whether or not the gas company owed to the plaintiff the duty of inspecting the service pipe of the board of education; and, second, whether the court committed error by not granting the motion of the gas company for a judgment in its favor at the conclusion of all of the evidence in the case.

From the record in this case, we are of the opinion that reasonable minds could conclude only that the service pipe was owned and exclusively controlled by the board of education; that when the improvement was begun the service pipe was sound and in good condition; that, as a result of the improvement made by the board of education through the contractor upon its premises in the vicinity of its service pipe, said pipe, by reason of the settling of the soil, was broken just before said explosion, and a large quantity of

gas escaped into said building—which explosion was caused by the lighting of a fire in the board's building by the board's janitor; that there was no evidence of the discovery of escaping gas before the explosion.

In view of such facts, the gas company is not legally responsible for the consequences of said explosion, unless, by reason of other facts and circumstances, a legal duty rested upon the gas company "to properly inspect the performance of the said work so as to reasonably assure itself that the said work had been performed without injury" to said service line, as charged in the petition.

It is the settled rule that a company transmitting gas in its pipes in the streets is charged with a legal duty to use a high degree of care, not only in the installation of such pipes, but in the use of them thereafter, to prevent gas escaping therefrom. If gas does escape and injures others, the fact that the gas company did not have notice of and did not know that its gas was escaping, is no defense in an action to recover damages therefor. Under such circumstances, its legal duty extends to making proper inspection to discover such escape.

The rule as to the legal duty of the gas company in reference to the escape of gas from service pipes owned and controlled by others on private property, which pipes have been properly installed and tested, does not extend to thereafter making inspection, unless the gas company has knowledge of a probable defective condition in such pipes, or has knowledge of circumstances rendering it probable that gas is escaping therefrom.

"5. It was not error for the Court of Appeals to reverse a judgment rendered upon a verdict for the plaintiff and to enter final judgment for the defendant, where, in an action for damages for the destruction of

a building caused by the explosion of natural gas which escaped from a defective service pipe connecting defendant's street main with the fixtures in the building, the only evidence from which a duty on the part of the defendant to inspect or repair the pipe could be inferred was that the pipe was used only to convey gas from defendant's main into the building and that the defendant owned and controlled the meters, attached them to the service pipe and read them." *Hamden Lodge* v. *Ohio Fuel Gas Co.*, 127 Ohio St., 469, 189 N. E., 246.

See, also, *Lennon, Admx.*, v. *Union Gas & Electric Co.*, 4 Ohio App., 153; *Cooper* v. *Tri-State Gas Co.*, 3 Ohio App., 77; *Portsmouth Gas Co.* v. *Maddox*, 44 Ohio App., 288, 185 N. E., 527.

Of course, if a gas company has contracted to inspect, it is its legal duty to do so; likewise, if a franchise by virtue of which a gas company operates provides for inspection of service pipes not owned or controlled by the company, it would be the legal duty of the company to inspect them; but there is no evidence in this case of any contract or franchise obligation to inspect such service pipes.

Also, it is conceivable that a gas company, as to service pipes owned and controlled by others on private property, may assume an obligation to inspect the same to the same extent and under the same circumstances as it is its duty to inspect the pipes in the street which it owns and controls, and, by general and continued discharge of that obligation, may establish a custom by reason of which it may create a legal duty to inspect the same; but in this case there is no evidence of an assumption of such an obligation on the part of the gas company.

It is also conceivable that a gas company may, in like manner, create a legal duty when such service

pipes are installed, or repaired after being installed, to inspect the same before turning or returning its gas into said service pipes. Likewise, it is conceivable that a gas company may, in like manner, create a legal duty to make, at proper intervals, spudding tests along said pipes, to detect whether there is any leakage of gas.

But in such cases the legal duty is, of course, confined to the obligation thus assumed, and cannot properly be enlarged, either by the court or by the jury, to include a duty to inspect or spud where the owner and controller of service pipes makes an improvement on his premises in close proximity to his pipes, and gives no notice to, or makes any request of, the gas company relative to his improvement.

In this case, although no custom of any character was plead, evidence was introduced without objection as to the practice of the gas company in regard to inspection and tests made by it of service pipes on the property of and owned and controlled by its customers, but there is no evidence whatsoever of any custom on the part of the gas company applicable to the circumstances shown by the record in this case, and the record does disclose that the gas company followed and conformed to any and all customs as to which any evidence was introduced.

The record does not justify the conclusion that the gas company had or was charged with knowledge that the board of education was making an improvement upon its property in such close proximity to the board's service pipe as to involve the removal and replacement of the earth thereunder; but assuming that a jury might find that it was charged with such knowledge, the gas company, not being requested so to do, was under no legal obligation to supervise said work, or, by constant inspection as the work progressed, to make

sure that the board of education did not damage its own pipe which was under its exclusive control.

There was nothing in the situation, known to the gas company, which, in the absence of a request by the board of education or its consent thereto, would justify the gas company in shutting off the gas from the board's service pipe. At no time before the explosion did the gas company know of the existence of a dangerous condition or of circumstances rendering it likely that such condition would arise from the making of said improvement.

At the close of all of the evidence, the court should have determined as a matter of law the question of the legal duty of the defendant in this case; instead of doing so, the court left that question to the jury, and charged them that if they found that a duty of inspection on the part of the gas company existed, "or can be reasonably inferred from a custom upon the part of the gas company to inspect service lines in the city of Barberton," the gas company would be negligent if it failed to so inspect.

Not only that, but the court charged the jury that, if it found "by a preponderance of the evidence that it was the duty of the defendant company to inspect said service line * * *, it would be the duty of the defendant company to exercise ordinary care, as I have explained that to you, to maintain such a system or means of reasonable inspection as to the times thereof and manner thereof, as would insure reasonable promptness in the detection of leaks which would probably occur, from any cause, which the defendant company should reasonably have foreseen or anticipated would, as a natural and probable consequence of such cause, result in leaks."

Thus the court permitted the jury to determine that it was the duty of the gas company to anticipate and

guard against the consequences of the negligence of the contractor in the construction of said sewer, and place upon the gas company a duty as great as it owed in reference to its pipes in the street, which were owned and controlled by it.

In so charging, the court was clearly in error, for which error, in and of itself, the judgment would have to be reversed.

There were also other prejudicial errors in the charge, to which we will not take the time to specifically call attention.

In view of the summation of facts which we have found to be established as a matter of law, and which we will not here repeat, it was the duty of the trial judge to grant the motion of the defendant for a judgment in its favor; and for error in not doing so, the judgment is reversed, and final judgment in favor of the defendant is ordered.

*Judgment reversed.*

Doyle, P. J., and Stevens, J., concur.