CHARLES E. CLOUGH, APPELLEE, v. NORTH CENTRAL GAS COMPANY, A CORPORATION, APPELLANT, KENNETH P. GRIER ET AL., APPELLEES.

34 N. W. 2d 862

Filed November 26, 1948. No. 32469.

*Mothersead & Wright* and *Robert G. Simmons, Jr.*, for appellant.

*Atkins & Lyman* and *True R. Ferguson*, for appellee Charles E. Clough.

Heard before PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

Messmore, J.

This is an action for damages for personal injury incurred by the plaintiff and the loss of personal effects alleged to have been caused by the negligence of the defendant in failing to properly service and maintain natural gas lines in the city of Minatare, a city of the second class. The case was submitted to the jury, resulting in a verdict for the plaintiff. Upon the overruling of motion for new trial defendant appeals.

For convenience the appellant will hereinafter be referred to as the gas company, and appellee will retain the original designation of plaintiff.

On March 10, 1931, the proper officials of the city of Minatare passed Ordinance No. 110 granting the gas company the right and privilege to conduct, maintain, and operate in the public streets, alleys, and public ways, a pipe line, or pipe lines, for the conveyance and transmission, supply and distribution of natural gas in the city. Section 8 of the ordinance provides: "The opening of any and all streets, lanes and alleys and public places by the grantee, its agents or employees and the laying and erecting by them of any and all mains, pipes or other fixtures and appliances, under and by virtue of this ordinance shall at all times be subject to and under the rules, regulations and ordinances of said City and all streets, lanes, alleys and public places opened under and pursuant thereto shall be restored within a reasonable time thereafter to as good condition as is practicable * * *."

Section 10 provides that power and permission is granted the gas company to tap and make connections with said pipe line, or pipe lines, for the purpose of selling, furnishing, and distributing gas to the consumers within the city, and to lay and construct such connecting and distributing pipes in and under the streets, alleys, and public ways within the corporate limits of the city.

The ordinance provided that upon the acceptance by

the gas company within 30 days after the passage thereof, the ordinance would be in full force and effect. The gas company accepted the grant and the franchise.

Ordinance No. 110 constitutes a contract between the city of Minatare and the defendant gas company. See City of University Place v. Lincoln Gas & Electric Light Co., 109 Neb. 370, 191 N. W. 432. The authorities are practically united that ordinarily a grant to a gas company of the right to supply gas and to use the streets is a franchise and, after its acceptance and performance, becomes a contract. See 38 C. J. S., Gas, § 11, p. 633.

Ordinance No. 114 was passed and came into force and effect on July 9, 1931. This ordinance related to natural gas and was for the purpose of governing the installation of gas fittings; to provide for the inspection thereof; and to provide for the regulation and operation of natural gas service to citizens and other persons within the corporate limits of the city. Section 16 thereof provided: "The grantee of any natural gas franchise by said city shall furnish and install for its customers reliable meters and shall keep in repair and maintain all pipe-lines up to and including the meters without cost to the customer; all meters used by grantee shall at all reasonable times be subject to inspection by the City, and the City shall have the right to test said meters at reasonable times."

The gas company contends that Ordinance No. 114, constituting exhibit No. 9 and being a copy of the ordinance, was improperly admitted in evidence.

The city clerk since October 1941, testified he had charge of a part of the city records which included the ordinances; that he did not have the actual record or the minute book showing the procedure of the mayor and city council with reference to ordinances for the year 1931; and that he had made search for them and found two copies, one, Ordinance No. 110, the other Ordinance No. 114, in the bottom drawer of the old city files. The

publisher of the local newspaper of the city since 1925, testified that he kept a permanent file and had such file for the year of 1931; and that on July 16, 1931, publication of Ordinance No. 114 for the city of Minatare appeared in the paper. The gas company contends this publication was erroneously admitted in evidence. The publication shows the official proceedings of the city council of date July 9, 1931. These proceedings show the special session of the council called to order by the mayor to consider Ordinance No. 114; the councilmen present; that they waived the receiving of written notice; the vote; and the procedure with reference to the adoption of the ordinance.

The gas company argues that the city has failed to prove that the ordinance was in existence and has further failed to prove the number of councilmen representing the city, or that they had notice of the special meeting; and further, that the provisions of the statutes requiring certain procedure to be taken were not complied with, citing sections 17-103, 17-106, 17-613, and 17-614, R. S. 1943, of which we have taken cognizance.

Section 25-1282, R. S. 1943, provides that a certificate of a public officer that he had made diligent and ineffectual search for a paper in his office is sufficient proof of the lack of the record. The city clerk did so testify, as hereinbefore set forth. Nonexistence of record may be proved by anyone who has made search therefor. See Smith v. First Nat. Bank of Chadron, 45 Neb. 444, 63 N. W. 796.

This court has allowed and approved official records to be proven by secondary evidence. In City of Scottsbluff v. Kennedy, 141 Neb. 728, 4 N. W. 2d 878, it was held: "As evidence of compliance with the statute requiring the publication of notice, the trial court properly admitted proofs of publication sworn to by the publisher of the newspaper in which they were printed, which were found among the city's records, and the testimony of the publisher as to the fact of publication." See, also,

Larson v. Cox, 68 Neb. 44, 93 N. W. 1011; Regier v. Shreck, 47 Neb. 667, 66 N. W. 618.

There is no question but that secondary evidence as to the contents of a written instrument may be introduced where proof is made that the writing has been lost or destroyed. The copy of the ordinance is the best evidence of its contents. The secondary evidence in the instant case is sufficient, and the company's contention is without merit.

The record discloses that the Grier building, where the explosion of natural gas occurred and this is not denied, is located on Lots 7 and 8 of Block 10 of the original town of East Minatare. It is on the south end of Main Street, on the east side facing west. It is faced with brick, with plate glass windows and a flat roof. The floor is cement. The building apparently covers Lot 8, which is 140 feet in length. The south entrance to the building is equally distant from the front and rear. There is a rear entrance also. The building is solidly partitioned about 30 feet from the rear thereof and has a door in the partition. The Chambers building, occupied by a real estate and insurance agency and a dentist, is located on Lot 9 of Block 10, and adjoins Lot 8 on the north. It is a small wooden building of about 25 x 30 feet. There is about one foot distance in space between the Grier building and the Chambers building. On the back part of Lot 9 there is a cement-block garage practically 25 feet in length and 35 feet in width. The garage faces north, and north of the garage door is a street. East of the garage and east of the Grier building is an alley. The rear of the Grier building and the east side of the garage are about on the alley line. Between the two buildings on Lot 9 there is a vacant space where refuse is piled.

The natural gas was turned on in September 1931, and installed in the Chambers building in 1933. This service line was put in by a Mr. Zimmerman who at that time was the owner of the Chambers building, and installed

by a plumber for him and paid for by him. The two meters that meter the gas for the Chambers building are east of it, about a foot and a half from the building. There are three shut-offs, the first a shut-off riser before the gas goes to the regulator, and the other two to shut off each meter individually. These shut-offs were manual, as was the main.

The dentist occupying the Chambers building used gas continuously; the other party, engaged in the real estate and insurance business, only through the heating season. Gas from the main was in the service line all of the time for both meters, whichever one was being used. This is apparent because the gas belongs to the gas company until it is sold through the meter to the consumer. Consumers were billed on the amount of gas consumed, as shown by the meters. There was no gas metered into the Grier building.

On October 6, 1945, the plaintiff entered the south entrance of the Grier building to see a man who was helping Mrs. Grier fix a heating stove located to the west of the south entrance. Plaintiff and the repairman went into the back room. Later another person came into the back room. Mrs. Grier also entered the back room and then left and closed the partition door. Somebody lit a cigarette and the room caught fire all over, "flames flickering around in different places right in the air." The plaintiff sought to escape by opening the partition door. When he opened this door the air from the outside coming through caused the explosion. Plaintiff suffered severe burns and loss of personal effects, the extent of which is testified to in the record.

The operator of the insurance agency, Mrs. Agnes A. Kelso, identified the Chambers building, the dental office, and the Grier building from an exhibit. The plaintiff offered to prove by her that she called the manager of the gas company four days before the explosion in the Grier building, to make a test with reference to the gas equipment on account of the odor of gas;

that pursuant to the call the manager of the gas company came to her office and checked the stoves and connections leading from the stoves to the meter; that there is a window in the south side of the office building which is approximately 11 inches from the north wall of the Grier building, which she always keeps open; and that through the window and in both rooms of the office there was a strong odor of gas which remained until the service line was shut off from the main line after the explosion in the Grier building. Plaintiff also offered to prove that there was the same odor of gas in the Grier building four or five weeks prior to the explosion when this witness had been in the Grier building and noticed the odor and called Mrs. Grier's attention to it. This offer to prove will be discussed later in the opinion.

The manager of the gas company in the city from May 1931 to April 1947, testified that he knew the Grier building and the Chambers building; that there were separate meters for each of the occupants of the Chambers building although the service line to the meters was the same; and that after the installation of the line he never had any notice of leaks or of the presence of gas in the vicinity. He further testified that pursuant to the request made by the operator of the insurance agency he made an investigation in the Chambers building. He was the only employee of the company in the city prior to and at the time of the explosion. He applied soap to the joints, checked the two stoves, checked the lines to the regulators, and found nothing wrong. He found no gas escaping from any of the lines inside the building. All he could find was an accumulation of dust on a radiant fire which seemed to throw off an odor, and after he cleaned the radiants the odor disappeared. He further testified that the gas company has a special department to inspect and discover leaks and that it was not his duty to do so; that such department is located at the main office in Scottsbluff; that after the

inspection he made with reference to gas leaking in the Chambers building, he made no investigation of the service line and made no request of the gas company to inspect the service line into the Chambers building; and that gas has a distinctive and detectable odor due to the application of cal odorant.

A chemical engineer testified that he made a grid of the vacant part of the lot through which the service line ran, and tested every three feet of the grid from the garage to the Chambers building and from the Grier building to the curb. In his investigation he found gas in the soil in explosive and dangerous quantities near the garage on the east end of the lot. It tapered off to none at the Chambers building at the west end, and gas was present in the soil in the lot north of the Grier building. He found no gas along the main for a couple of hundred feet north and quite a distance south at the back of the Grier building. This indicated that there was none to the east at the alley, none to the north along the main, and none to the north of the vacant lot, and that it died off as you went west on the vacant lot. It meant that the gas was coming from a point toward the southeast corner of the vacant lot as the concentration was greatest there, and that it was prone to go to the Grier building. It tested very strong against the north side of the wall of the Grier building. The test toward the north wall in the back room of the Grier building showed presence of gas. He broke through the cement floor of the garage building on the rear of the Chambers lot, exposed the service line, and found the pipe with holes in it due to corrosion which he estimated had developed in a period of from three to six months. He testified that the holes in the pipe came from outside, and that the gas had been escaping from them for a minimum of from three to six months. The pipe he removed from the service line showed no evidence of protection from erosion or perforation. In referring to the holes found in the pipe, this witness testified that:

"Material simply gets thinner and thinner until it is only the thickness of a molecule and that is through, but that particular instant the gas starts escaping and then the corrosion continues and enlarges the hole. There was something in the pipe at that particular point, in the make up of the pipe, which caused that particular spot to start the corrosion and not some other particular spot." He gave as his opinion that the fire and explosion were caused by a spark or flame igniting a mixture of gas and air which came through the crack in the floor of the Grier building, coming to that point from the soil beneath the building, and to that point from the leak in the service line under the garage on the rear of the lot north of the Grier building. The place where the gas came into the Grier building was about 9 feet south of the place where the holes were found in the pipe, and the gas passed freely into the Grier building. The service line underneath the garage floor was about 30 inches in the ground.

A maintenance engineer of gas distributing systems testified that good practice for gas companies with pipes in corrosive areas requires the making of inspections every six months. He knew of no conditions that would require an inspection oftener than that.

The gas company contends that Ordinance No. 114 is unconstitutional and that Ordinance No. 110 constituted a contract between it and the city. Under Ordinance No. 110 there was no duty upon the gas company to repair and maintain the consumer's service lines without cost to the consumers, nor was there any other law or duty upon the company to keep the service lines in repair at their own cost. Ordinance No. 114 placed an additional burden on the gas company, one that it did not have at the time of the passage of the ordinance and one which substantially lessened the value of the franchise. Therefore the defendant contends this ordinance was unconstitutional in that it impaired the obligation of the franchise contract and took the property of the gas

company without due process of law.

In this connection the gas company relies upon the case of City of Plattsmouth v. Nebraska Telephone Co., 80 Neb. 460, 114 N. W. 588. In this case the city granted the telephone company the right to use the streets, alleys, and public grounds of the city in the construction, operation, and maintenance of its system. Thereafter the city, by subsequent ordinances after the construction was made, made certain requirements for underground conduits. This court held: "When an ordinance of a city has invited investments and expenditures, which are made in good faith and in reliance upon it, the city authorities, if the use be a public one, cannot arbitrarily impose by subsequent regulations, without necessity or the demands of public convenience, additional burdens upon the company which are clearly beyond the reasonable exercise of the police power." Other cases are cited to the same effect.

Applying the holding to the instant case, it is the gas company's contention that Ordinance No. 114 places additional burdens upon it for the reason that it requires it to pay the cost of maintenance of service lines on consumer's property which it did not do before and which made the franchise less valuable; and that the ordinance does not purport to be a regulatory ordinance. It is apparent that in the instant case Ordinance No. 114 was passed prior to the time of the completed construction of the gas system.

Section 17-505, R. S. 1943, provides in substance that in addition to their special powers second-class cities shall have the power to make all such ordinances not inconsistent with the laws of the state, as may be expedient for maintaining the peace, good government, and welfare of the corporation, and its trade, commerce, and manufactories.

The gas company further contends that even though Ordinance No. 114 was passed as a regulatory measure under the general welfare statute, section 16 thereof,

heretofore set out, is unconstitutional as an arbitrary and unreasonable regulation in that it imposes an unjust burden upon it; that the service lines are on the consumer's property, installed by the consumer at the consumer's expense; and the welfare of the city does not require that the consumer be relieved from liability of maintaining his own service line.

In determining this appeal the rule announced in Weekes v. Rumbaugh, 144 Neb. 103, 12 N. W. 2d 636, 150 A. L. R. 129, is applicable. "Every legislative act comes before this court surrounded with the presumption of constitutionality and this presumption continues until the act under review clearly appears to contravene some provision of the Constitution."

The ordinance under consideration is presumed to be valid, and the burden is upon the gas company to show that having regard to the facts disclosed by the record, the regulation imposed by Ordinance No. 114 is so unreasonable and arbitrary as to amount to depriving the gas company of its property without due process of law.

Undoubtedly the city, acting as an arm of the state, has a wide discretion in determining what precautions in the public interest are necessary or appropriate under the circumstances. See Terrace v. Thompson, 263 U. S. 197, 217, 44 S. Ct. 15, 68 L. Ed. 255. See, also, New Orleans Public Service Inc. v. City of New Orleans, 281 U. S. 682, 50 S. Ct. 449, 74 L. Ed. 1115; Littlefield v. State, 42 Neb. 223, 60 N. W. 724, 28 L. R. A. 588, 47 Am. S. R. 697; Peterson v. State, 79 Neb. 132, 112 N. W. 306, 14 L. R. A. N. S. 292, 126 Am. S. R. 651.

Section 17-127, Comp. St. 1929, in force at the time the ordinances in question were passed, provides in substance that a city of the second class has a right to grant a franchise subject to this section for a period not exceeding twenty-five years to any company to lay and maintain gas mains, pipes, service and all other necessary structures for the purpose of furnishing gas to the inhabitants thereof, and provides that such city

may after such period, make any reasonable regulation with reference to any corporation holding such franchise either as to charges for such gas or otherwise.

Section 17-138, Comp. St. 1929, in part provides: "To regulate and prevent the carrying on of manufactories dangerous in causing and promoting fires."

It is apparent from the foregoing statutory provisions that the city has the authority to regulate the gas company in the reasonable exercise of its police power.

In the exercise of police power delegated by the state legislature to a city, the municipal legislature, within constitutional limits, is the sole judge as to what laws should be enacted for the welfare of the people, and as to when and how such police power should be exercised. In testing police regulations, the court should inquire whether they have some relation to the public health, safety, or welfare, and whether such is in fact the end sought to be attained. See, State v. Withnell, 91 Neb. 101, 135 N. W. 376, 40 L. R. A. N. S. 898; Peterson v. State, *supra.*

It is an established rule of law that where the owner of property devotes it to a use in which the public has an interest, he must, to the extent of the interest thus acquired by the public, submit to the control of such property by the public for the common good. Gas companies are generally within the application of this rule, for a corporation like a gas company, dependent for the conduct of its business upon a license to use in part the highways, its rights in which are acquired avowedly for a public use, is something more than affected with a public interest. Its business is public. Accordingly, it has been held that the state, as a means of protecting the general public, may establish and enforce regulations that are not inconsistent with the essential rights granted by a gas company's charter, and it may also delegate its right of regulation to a municipality. Under such a delegation of power a municipality may enact ordinances to protect the public from the dangers resulting from the use of gas, by imposing certain obliga-

tions upon gas companies. However, even where there is no express delegation of authority by a state to a municipality, it has been held, in some jurisdictions, that municipalities, under implied and inherent police powers, possess sufficient authority to impose on gas companies' operating within their limits all reasonable regulations which are necessary for the health, safety, or welfare of the city's inhabitants.. See, 24 Am. Jur., Gas Companies, § 3, p. 672, also, 16 C. J. S., Constitutional Law, § 281, p. 701.

The power to regulate the use of the streets of a city by a gas company is not exhausted by the regulations prescribed by the municipal authorities at the time of granting the consent to use the streets. It is a continuing power, and cannot be bargained away or otherwise parted with. See, 38 C. J. S., Gas, § 3c, p. 620; City of New York v. Woodhaven Gaslight Co., 181 App. Div. 188, 168 N. Y. S. 429; Cincinnati Gas Light and Coke Co. v. Avondale, 43 Ohio 257, 1 N. E. 527.

The prohibition contained in constitutional provisions against impairing the obligation of contracts is not an absolute one and is not to be read with literal exactness like a mathematical formula, for the reason that it is apparent under the law that cities of the second class may make reasonable regulations with reference to the use of its streets, alleys, and public ways, and for the protection of the public health and welfare of its inhabitants, where the same are not arbitrary and unreasonable and relate to a company furnishing natural gas to its inhabitants. See 16 C. J. S., Constitutional Law, § 281, p. 701.

We conclude that the regulation imposed on the gas company by section 16 of Ordinance No. 114 does not impair the franchise contract evidenced by Ordinance No. 110. It is not an unreasonable or arbitrary regulation but comes within the police power of the city as provided for by law, and is not violative of the Constitution of the United States or of the State of Nebraska.

The basis of the plaintiff's cause of action is that, as provided for in section 16 of Ordinance No. 114, the duty to maintain the service line in question was on the gas company and therefore it was its duty to inspect its gas service lines for the purpose of discovering leaks, and its failure to properly inspect the gas service line in question constituted negligence on its part and creates liability against it for the personal injuries and loss of personal effects suffered by the plaintiff by virtue of the explosion.

The gas company cites Stephany v. Equitable Gas Co., 347 Pa. 110, 31 A. 2d 523 as to the liability of gas companies for natural gas explosions arising from defects in the lines of customers where the line is installed and paid for by the customer. On p. 113 it is said: "As to conditions arising from defects in the lines of consumers the responsibilities of the gas company are different for there it is the duty of the consumer to see that his lines are maintained in serviceable condition. The company knows that it is dealing with a dangerous agency and if it knows or should have known that the consumer's lines are not safe it is its duty to require the lines to be repaired or else to shut off the gas at the curb: Windish v. Peoples Natural Gas Co., supra, (248 Pa. 236, 93 A. 1003) p. 240. If it does not have such knowledge and there is no reason why it should have known that fact, it is the consumer and not the distributor who is responsible. The responsibility of the gas company arises from knowledge of a dangerous condition and not by reason of the condition."

In Wilson v. East Ohio Gas Co., 68 Ohio App. 490, 42 N. E. 2d 180, it is said that the legal duty of a gas company as to third persons in reference to the escape of gas from service pipes owned and controlled by others on private property, and leading from the company's pipes in the street to its meter in the customer's building, which pipes have been properly installed and tested, determined to be safe for use, and actually safely used

for some time, does not extend to thereafter making inspection of said service pipes, unless the gas company has knowledge of a probable defective condition in such pipes, or has knowledge of circumstances rendering it probable that gas is escaping therefrom, or unless the company is bound by contract, franchise, or custom to make such inspection. See, also, Kelley v. Public Service Co., 300 Ill. App. 354, 21 N. E. 2d 43.

In the annotation to 138 A. L. R., p. 883, in speaking of defects in customer's service line or appliances the rule stated is, in substance, that generally speaking, a gas company which does not install, own, or control the pipes or appliances in a customer's building is in no way responsible for the condition in which they are maintained, and consequently is not liable for injuries caused by a leak therein of which it has no knowledge. This rule is followed extensively in this country.

Referring to the testimony of the local manager for the gas company, it is apparent that he made no investigation or inspection of the service line to the Chambers building and requested none from the gas company. While he did testify that inspections were made, it is apparent that no inspection of the main in the alley that served the line to the Chambers building was made within a reasonable time. The plaintiff offered testimony of an occupant of the Chambers building who called the local manager for the gas company to make a test of gas that was escaping in that building. This evidence heretofore appears. It was obviously offered to show that the gas company had received notice that there were defects permitting the escape of gas in the Chambers building or immediate vicinity thereof.

"Testimony referring to prior gas leaks and repairs, introduced solely to establish that defendant's employees who performed the work involved in the present suit were its authorized agents to receive notice of such defects and to make repairs for the company, and not

offered to show prior negligence of defendant, was properly admitted in evidence." Heller v. Equitable Gas Co., 333 Pa. 433, 3 A. 2d 343.

"* * * a gas company owes the duty to the general public to so operate its business and maintain its pipes as to prevent the escape of gas therefrom in such quantities as to become dangerous to life or property." Newill v. Atlanta Gas-Light Co., 48 Ga. App. 226, 172 S. E. 232.

In Heller v. Equitable Gas Co., *supra,* the court held: "Where a public utility company engaged in the business of furnishing gas to its customers knows or should know that a service pipe owned by a customer is corroded to such an extent as to permit gas to escape, it is its duty either to cause the service line to be repaired by the customer, or to have the gas shut off at the street, in order to avoid the danger that might result."

In Julian v. Sinclair Oil & Gas Co., 168 Okla. 192, 32 P. 2d 31, where the gas company contended that since it was not the owner of the pipes at the point where the gas escaped it was not charged with the responsibility of inspecting said pipes and was not liable for injuries caused by faulty materials which it did not own, the court said: "As we view it, this fact alone would not absolve the company from liability. The gas which caused the damage was defendant's gas, and was turned into the pipes by defendant with knowledge on its part that it was a highly dangerous substance and subject to escape. Through the duly appointed agents and employees, defendant was charged with knowledge that its gas was being transported through the pipes in question." And the question as to whether the gas company had exercised such a degree of care and caution as was commensurate with the known danger of natural gas was held an issue of fact which under proper instructions should be submitted to a jury.

Thus, where it appears that a gas company has knowl-

edge that gas is escaping in a building occupied by one of its consumers it becomes the duty of the gas company to shut off the gas supply until the necessary repairs have been made, although the defective pipe apparatus does not belong to the company and is not in its charge or custody. See Clare v. Bond County Gas Co., 356 Ill. 241, 190 N. E. 278.

We believe the record discloses evidence sufficient from which the jury could find that the gas company had notice of the dangerous condition existent, and if it did have such notice, it becomes a question for the jury whether or not it made proper inspection and repairs with reference thereto.

For the reasons given in this opinion, the judgment of the district court is affirmed.

AFFIRMED.