Ellen Louise Kelley, By E. C. Kelley, Her Father and Next Friend, Appellee, v. Public Service Company of Northern Illinois, Appellant.

Gen. No. 9,387.

Opinion filed April 20, 1939. Rehearing denied May 22, 1939.

HAMILTON, BLACK & KLATT, of Peoria, for appellant; KENT J. OWENS, of Chicago, of counsel.

F. B. BRIAN, of Toulon, and HARRY C. HEYL, of Peoria, for appellee; J. E. RICHARDS, of counsel.

PER CURIAM.

Appellee brings this suit against appellant in the circuit court of Peoria county, by her father as next

friend, to recover damages for personal injuries sustained in and about the operation of a switch in connection with an electric motor, used to pump water from a well located on the premises upon which appellee resided with her parents.

The farm in question was located in Stark county. It was owned by Mr. Gleason of El Paso, Illinois. Appellee's father, Mr. Kelley, had been the tenant on this farm since 1928. There was a water well on the premises for the purpose of furnishing water to the livestock and for domestic use by the family of Mr. Kelley. This well was operated by a windmill and by an ordinary hand pump. The windmill had become unsatisfactory through use, and Mr. Kelley was anxious to determine what the comparative cost would be between a new windmill and an electric motor, to pump the well. He met Webber and Owen, two of appellant's representatives, on the street in the city of Wyoming, at which time he acquainted them with the above situation and discussed with them what would be the cheapest method to obtain the results desired. These men told him they would figure the matter up as to the probable cost of electric equipment and would let him know. Subsequently, they visited the premises in order to obtain the necessary information as to the size of the motor and pump needed. Mr. Kelley there advised them that he could make no arrangements for the purchase of same, as he was only the tenant, and they would have to see Mr. Gleason, the owner. About a week later, Mr. Kelley and Webber went over to El Paso and saw Mr. Gleason, who agreed to purchase and install the equipment necessary to pump the well by electricity. This was in November, 1932.

A small wooden pump house was constructed about the well, which housed the pump and electric equipment. The installation of the pump, motor, switch and electric equipment was made by the Bacon Electric

Supply Company of Chillicothe, Illinois. After the equipment was installed, appellant company through some of its service men, set a meter in the pump house immediately above the switch box. The switch box was attached to the inside wall of the pump house, about five feet from the ground, and was a closed metal box with an iron lever or arm extending outside the box, for the purpose of engaging and disengaging the motor with the electric current. This operation was performed by pushing the iron lever or arm up or down, as the case might be. The installation of the equipment was completed and the electric current connected about December 1, 1932, at which time the pump was put in operation and has so continued from that time hitherto.

Appellee returned home from school on the afternoon of April 18, 1935, at about the hour of 4:30. She was then 12 years of age. She and her brother were helping with the evening chores about the farm. During this time, the electric current had been applied to the motor, and the pump was in operation pumping water to a tank used for watering the stock. After they finished with this work, and at about 6:30, appellee went to the pump house to shut off the motor. She states that she had operated the switch many times. On this occasion when she pulled down the lever or arm to shut off the current, she says that the switch seemed to explode and that fire shot all over the pump house, whereupon she ran out into the open. Mr. Kelley saw appellee as she ran from the pump house. He states that the bottom of her skirt was afire; that he ran to the barnyard where she was and attempted to extinguish the fire from her skirt, but that her underclothing was afire; that he called to the house for help, and they brought him a blanket, which he used to smother the fire the best he could. Appellee's hands, face and legs were severely burned.

It is claimed on behalf of appellee, that natural gas escaped from the ground through the well in such quantities as to make the use of the electric switch dangerous, and that appellant with full knowledge of this condition, connected its electric current to the equipment in December, 1932, and continued to furnish such electric power from that time to April 18, 1935, the date of the accident. It is urged by appellee that appellant was negligent in this respect; that the type of switch to which it connected its electric service in this instance should have been placed upon the outside of the pump house; and that the only type of switch to which appellant should have connected its service inside the pump house was a type designated as a nonexplosive switch, the same being inclosed in a heavy metal or cast-iron box that is air-tight so that gas cannot become ignited by the throwing of the switch.

The switch and the electric equipment connected with the pump were installed by Sam Potter, who was an employee of the Bacon Electric Company. He denies that Mr. Kelley said anything to him about gas escaping from the well, and denies that he had any knowledge of such fact. The negotiations regarding the installation of the pump were had by Mr. Kelley and the owner of the land, with Fred Webber, a representative of appellant company. Mr. Dale Owen, another representative of appellant company, was present with Mr. Webber on some of the occasions. When Webber and Owen went to the premises to look the situation over in order to determine what size motor and equipment would be necessary to pump the well by electricity, they talked with Mr. Kelley. They deny that he said anything about gas coming from the well. They pumped the well by hand at that time and say they detected no odor of gas nor anything unusual about the water. Mr. Kelley advised them he could make no arrangements for the purchase of the equip-

ment, and that they would have to see Mr. Gleason, the owner of the land. About a week later, Kelley and Webber went over to El Paso to see Mr. Gleason about purchasing electric equipment to pump the well, and do away with the windmill and the hand pump. Webber advised Mr. Gleason the approximate cost of the equipment. Mr. Gleason agreed to purchase same and it was later installed by the Bacon Electric Company, by its employee, Potter. Potter, Owen and Webber all deny they knew anything about gas escaping from this water well and deny that Kelley said anything to them about it. Kelley, however, claims that he told each of them about the gas both before the equipment was purchased and installed, and after such installation.

Mr. Gleason, the owner of the land, was agent for the Illinois Central Railroad Company at El Paso. He had been with this company for 30 years. He testifies about the visit that Mr. Kelley and Webber made with respect to presenting to him the proposition of installing electrical equipment for pumping the well. He says no one was present except the three of them; that they talked the matter over; and that he agreed to replace the windmill with the electric equipment. He says he does not remember Mr. Kelley saying anything about gas being in the well.

The evidence shows that the equipment was installed and put in operation about the first of December, 1932, and was continued in daily use thereafter. It was on April 18, 1935, that appellee in throwing the switch, sustained the burns resulting in her injuries. She was a child of some 12 years of age and did not know what caused her dress to catch afire, except she says that fire flew when she pulled the switch. Mr. Kelley continued to operate the switch as usual for several days after the accident, when he had an electrician put an auxiliary switch on the outside of the pump house.

The switch inside the pump house was then left turned on and the switch on the outside of the pump house was used to control the current.

It is the position of appellee that gas had escaped from the water well and collected in the pump house to such an extent that when she threw the switch on the evening in question, the electric spark resulting from such act, ignited the gas, causing an explosion, which resulted in setting fire to her clothing, from which she sustained her injuries. There is no definite evidence of an explosion, from the condition of the building. It was a very common wooden structure, having one window and a door. The window remained intact, and the electric equipment continued to operate as before. There was no eyewitness to the occurrence and it is impossible to determine what caused appellee's clothing to become ignited, other than what inferences might be reasonably drawn from the facts and circumstances appearing in evidence. Appellant urges that even though gas had accumulated in the pump house from the well, and caused the injuries, yet that it had no notice or knowledge of the existence of such gas and had no reason to believe the same existed. The only property of appellant located in the pump house was the electric meter. The question of knowledge on the part of appellant is the primary question to be determined before the other points in the case become material.

The representatives of appellant and of the electric company who installed the equipment, all readily agree that had they known of the existence of gas coming from the well as claimed, the switch box would have either been located on the outside of the building, or a nonexplosive type of switch box would have been figured in the cost of the equipment, in the event the switch was desired to be located inside the pump house.

The evidence fails to show knowledge on the part of appellant that gas was escaping in the manner claimed,

and the use of the equipment therefore dangerous. The fact that it had been in daily use from December 1, 1932 to April 18, 1935, is a strong factor going to show that neither appellant nor Mr. Kelley had any knowledge that the use of the equipment was dangerous as claimed. The evidence shows that Mr. Kelley and his family used the switch daily over the above period of time in starting and stopping the motor for the purpose of pumping this well. The electric wiring and equipment in the pump house belonged to Mr. Kelley's landlord. Appellant was in no way charged with the supervision or inspection thereof. We do not consider the evidence sufficient to show knowledge or cause for knowledge on the part of appellant, that the installation and use of the switch box in this case was dangerous as claimed. It is not claimed the switch box was in any way improper or defective, but merely that it was not the proper type to have been used where gas was present. The evidence, however, is that had the switch box been a nonexplosive type, or located outside the pump house, that when the switch was turned on to apply electric power to the motor, sparks would then ensue from the motor, regardless of what type of switch box might have been installed.

Appellant urges that it is the nature and tendency of escaping gas to rise in the atmosphere and spread itself over a room in approximately equal density; that before it would have come from this well and risen five feet from the ground, in sufficient quantity to have penetrated a closed switch box, surrounded an electric switch, and produced such an explosion as claimed, it would have spread itself over the entire room and the explosion would have manifested itself in a definite and destructive manner. Neither the pump house nor the equipment sustained any damage. Although appellee's injuries are not in dispute, yet the exciting cause thereof is a matter of conjecture and presumption. Proof of a mere possibility is not sufficient. A

theory cannot be said to be established by circumstantial evidence unless the facts are of such a nature and so related as to make it the only conclusion that could reasonably be drawn. It cannot be said one fact can be inferred, when the existence of another inconsistent fact can be drawn with equal certainty. The pumping equipment had been in daily use for nearly three years before the accident. Each time the pump was started or stopped, the electric switch was thrown. Subsequent to the accident, Mr. Kelley continued to use the switch, as had been his custom, until he later had an auxiliary switch placed on the outside of the pump house, when he closed the switch inside the pump house, and thereafter used the outside switch.

On the question of knowledge and liability, this case is governed by similar rules of law as in suits against gas companies. Generally speaking, a gas company which does not own the pipes and appliances in a customer's building, and which exercises no control over them, but merely furnishes gas to be used therein, is not responsible for the condition in which such pipes and appliances are maintained, and consequently is not liable for injuries caused by a leak or defect therein, of which such company has no knowledge. *Middleton v. DeKalb,* 168 Ill. App. 353. It is generally considered that unless the company has actual notice or knowledge of escaping gas, or is in possession of facts sufficient to put it upon notice thereof, the company cannot be deemed liable, though it may continue to furnish gas to such defective pipes or appliances. The owner or occupant of the premises is obliged to keep the pipe lines and equipment in repair or notify the company of their defective condition, otherwise the company is not liable for negligence. *Reid v. Westchester Lighting Co.,* 236 N. Y. 322, 140 N. E. 712, 29 A. L. R. 1247.

In this case the fixtures and equipment were the property of the owner of the premises, and there was no contractual duty resting on appellant to exercise control over such fixtures and equipment. Under such circumstances, the consumer assumes the burden of inspecting and maintaining such fixtures and equipment on his property in a manner reasonably suited to meet the services to which they are to be put, and the company has the right to assume that these duties have been performed by such owner. *Smith v. Pawtucket Gas Co.*, 24 R. I. 292, 52 Atl. 1078, 96 Am. St. Rep. 713.

The appellant's business upon the premises at the time it installed the electric meter was solely for that purpose and for the purpose of making a connection between its power lines and the meter, so that power could be applied to the equipment installed by the owner of the premises. It does not appear that appellant's employee who installed the meter had authority to do more than to make such connection and to see that the same permitted the proper flow of electric current to the owner's premises. There is no claim here that the connections were not properly made and successfully used over a period of nearly two and a half years before the accident, or that they were not successfully used thereafter.

Appellee predicates her case upon appellant's knowledge of the existence of this gas, which it is claimed rendered the use of the electric switch dangerous. It will be found in cases holding a defendant liable for similar injuries, that the defendant had notice and knowledge of the existence of the gas and did not use reasonable diligence to cut off such supply, with the result that injuries were sustained because of such neglect. The rule, regarding notice to the defendant being first necessary before a legal responsibility can arise in cases of this character, is recognized and ad-

hered to in the case of *Clare v. Bond County Gas Co.,* 356 Ill. 241. In that case the tenant of the building had reported to the defendant that he thought he could detect escaping gas. A representative of the defendant company made an examination of the premises, but could find no leak. Thereafter an explosion occurred.

There is insufficient evidence in this case tending to prove knowledge on the part of appellant as claimed. The judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*