Mary Mrdalj, Administratrix of Estate of Marko Mrdalj, Deceased, Appellee, v. Public Service Company of Northern Illinois, Appellant.

Gen. No. 41,416.

Opinion filed February 17, 1941.

GARDNER, FOOTE, MORROW & MERRICK, of Chicago, for appellant; WALTER M. FOWLER, of Chicago, of counsel.

CHRIS D. GREGORY, of Chicago, and SILVIO PIACENTI, of Chicago Heights, for appellee; LESLIE H. VOGEL and JOHN D. DE FEO, both of Chicago, of counsel.

MR. JUSTICE MCSURELY delivered the opinion of the court.

Plaintiff alleged that her father Marko Mrdalj, a widower, came to his death because of the explosion of gas in a cistern located on his property in Chicago Heights; that this explosion was because of leaking gas from the gas service pipes of defendant which supplied gas to the building on the premises; upon trial plaintiff had a verdict for $5,000, and defendant appeals from the judgment entered on the verdict.

The crucial question is the origin of the gas which exploded. Plaintiff attempted to prove it came from a leak in the underground service pipes of defendant, while defendant attempted to prove it came from methane, or sewer gas, coming from organic matter which was in the cistern.

The accident happened March 3, 1936. The decedent lived with his family of children in a two-story building, fronting south, on east Main street in Chicago Heights; the first floor was used for business purposes and the second floor for living quarters; commercial gas was supplied to the building by defendant from a main in the alley at the rear, and an underground service pipe connected this main with a system of pipes in the house; this service pipe was installed over 11 years before the explosion occurred; north of the main building was a brick garage with a concrete floor on the west side of the lot; the service pipe ran under this concrete floor; to the east of this was a concrete pavement; at the rear of the house was located a cistern, built 3 years before the accident; the service gas pipe was approximately 5 or 6 feet from the wall of the cistern; the cistern was about 12 feet deep and 8 feet in diameter and was circular in form; the wall was made of common brick and cement about 4 inches thick; the floor was bisected by a brick wall—"sort of filter," starting from the bottom of the cistern and running to about 2 inches from the top and all the way to the sides; rain water ran into the cistern by gutters and downspouts from the roof of the building and the water was drawn by an electric motor from the cistern

through a pipe into a storage tank in the basement of the building; the top of the cistern was covered with cement, except for an opening 18 to 20 inches in diameter, which was covered by a solid metal manhole cover.

Two or three months before the accident some of the members of decedent's family noticed the odor of gas in the rain water taken from the cistern. The daughter Mary testified that she was familiar with the odor of cooking gas and the odor that came from the water smelled like cooking gas. A daughter Ann testified to the same effect—that the water had the same smell as cooking gas. Other members of the family testified to the same effect. This odor was observed when the water faucets were opened. Also the odor was noticeable in the basement in the vicinity of the pipe leading from the cistern to the storage tank. There was abundance of evidence that a strong odor came from the cistern water.

About a month or so before the accident one of the daughters told the meter reader from defendant's office of the odor and that it was the odor of illuminating gas; he stated the odor probably came from something dead in the cistern. The odor of gas from the cistern water finally became so strong that the use of rain water in the house was discontinued.

About 10 days before the accident George, a son of decedent, went to defendant's office to pay the monthly bill for gas; after paying the bill as directed by his father he complained to defendant's cashier about the odor of gas in the water and was referred to the "Service Department," where he reported the odor in the water to a man in charge; he was told that someone would be sent out to investigate but the company made no investigation nor attempted to make any repairs. This testimony is not contradicted.

On the morning of March 3, 1936, Katie, a daughter of the decedent, and the decedent were washing the family automobile in front of the premises; they ob-

served the odor of gas from the water drawn from the cistern; after the noon meal decedent suggested that his daughter, with a helper, should finish the work on the car and he would go back in the cistern to investigate the smell; the meter reader's statement that the odor probably came from something dead in the cistern had been told to decedent; he went back to the cistern, throwing away a cigar he had been smoking, and carried a flashlight; about a minute or two later the explosion occurred.

The entire concrete covering of the cistern was blown away and debris and large pieces of concrete were blown about; a blue flame and smoke were seen coming from the cistern; a ladder was standing on the bottom of the cistern and extending out of the opening; debris and dirt were blown into the cistern. Decedent was found lying in the next yard to the east of his property; he was blown over a fence 7 feet high which separated the two lots; he was badly burned but alive when found, and an ambulance was called but before he was removed he died.

There was evidence that after the explosion, on the afternoon and evening of the same day, defendant sent a crew of men to decedent's building; they dug a ditch exposing the main in the alley and the service pipe; the service pipe was disconnected from the main; it was 9 or 10 feet long and when removed was found covered with layers of rust and the end of the pipe was, as a witness described it, "jagged looking like it was broken off." It was taken away by the men and subsequently a new service pipe was laid by defendant's workmen.

A chemical engineer, testifying as an expert for plaintiff, said that commercial gas of the kind distributed by defendant, when mixed with air, is explosive and can go through porous substances very easily; could pass through soil and substances composed of

brick, mortar and cement. From the facts shown in the record he gave it as his opinion that the explosion was the result of the accumulation of commercial gas in the cistern which reached the cistern by permeating or seeping through the intervening soil and porous walls of the cistern. He also testified that it would be impossible under the circumstances to produce a combustible gas in the cistern by the decomposition of organic matter. The expert called by defendant gave a contrary opinion but also testified that sewer gas created by the decomposition of organic matter cannot live in the presence of oxygen; that rain water would be saturated with oxygen and that the decomposition of organic matter in the presence of oxygen results in a nonexplosive gas.

Defendant argues that the bottom of the cistern contained decaying organic matter which would generate sewer gas in quantities sufficient to cause an explosion. The evidence, however, shows that all the time the odor of commercial gas was detected in the cistern water the water was clear and not dirty. Defendant's employees who observed the condition of the water were testifying as to its condition after the explosion when dirt and debris of all kinds had been blown into the cistern by the explosion. The case presented an issue of fact to be determined by the jury and it was not error for the court to deny defendant's motion to direct a verdict of not guilty.

We are also of the opinion the jury could reasonably find that the explosion was caused by commercial gas furnished by defendant. All of the witnesses who testified as to the odor for some months before the explosion, agreed it smelled like illuminating or cooking gas. When the service pipe was removed, almost immediately after the explosion, it was shown to be rusted through and defective. There also was evidence that the surface ground was frozen, and the garage floor

over the supply pipe and the surrounding area, covered by concrete, would form an impediment to the ready escape of gas to the surface.

*St. Marys Gas Co. v. Brodbeck*, 114 Ohio St. 423, is not in point. In that case there was evidence of a sewer opening into a garage from which sewer gas might escape; there was also in the garage a tank containing gasoline; the evidence showed that the meter and pipes from which it was claimed gas escaped were in good condition and there was no evidence of any notice to the gas company of any defect.

Defendant seeks to make some point out of the fact that the notice to the gas company was not given by the decedent in person. It was not important as to who gave the notice. The fact that defendant received notice of the leaking gas pipes is all that was necessary to charge defendant with the duty of investigating and making repairs.

Defendant further argues that under the Public Utilities Act (ch. 111⅔, § 38, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 112.057]) it was not permitted to shut off the gas for the purpose of making an inspection. This argument is entirely without merit. It has been held in a number of cases that where a gas company has knowledge that gas is escaping in a building occupied by one of its consumers, it is the duty of the gas company to shut off the gas supply until the necessary repairs have been made. *Clare v. Bond County Gas Co.*, 356 Ill. 241, *Kelley v. Public Service Co. of Northern Illinois*, 300 Ill. App. 354, 362, 363. See also *Edwards v. North Shore Gas Co.*, 289 Ill. App. 32.

It is next said that decedent was guilty of contributory negligence. It is a reasonable presumption that he had in mind to investigate the statement of defendant's employee that the odor came from something dead in the cistern. He first obtained a ladder and put it in the opening; he took a flashlight and threw away the cigar which he was smoking. These facts

would indicate that decedent was in the exercise of ordinary care.

Defendant argues there was no evidence that decedent was a person who habitually exercised care for his own safety, and cases are cited tending to support this point. *Newell v. Cleveland, C., C. & St. L. Ry. Co.,* 261 Ill. 505, and *Casey v. Chicago Rys. Co.,* 269 Ill. 386. In the first of these cases there was evidence tending to show that the deceased, some time prior to the accident, was intoxicated, and in the second case there was no evidence of the actions of the deceased for two and a half hours before he met his death. We are of the opinion there was sufficient evidence in this case that deceased was in the exercise of due care for his own safety. *Devine v. Delano,* 272 Ill. 166; *Chicago & E. I. R. Co. v. Beaver,* 199 Ill. 34.

There were no errors in the rulings on the evidence, nor were there any reversible errors in the argument to the jury. As was well said in *Devine v. Chicago City Ry. Co.,* 167 Ill. App. 361, 364: ". . . it is assumed in these cases that at the first warm and unjustified word thrown out by counsel, in the heat and enthusiasm of the argument, that the jurors will forget the evidence, the instructions of the court and the obligations of their oaths, and follow instead the unguarded and perhaps unjustified statement. However it should be borne in mind that it is the presumption of law that jurors are intelligent, honest, fearless and just. Courts are not justified in assuming that the mind of the jury is of such plastic and unreliable material as to at any unjustified word of debate neglect the instructions, abandon the evidence and disregard their oaths.''

Complaint is made of an instruction given at the instance of plaintiff. It in substance told the jury that if it found from the preponderance of the evidence that defendant was guilty of negligence as charged in the complaint and that such negligence proximately

caused the explosion and the death of Marko Mrdalj, and if he was at the time in the exercise of ordinary care for his own safety, they should find defendant guilty. It was said it was erroneous to refer to the negligence "as charged in the complaint." The complaint in this case was not taken by the jury, and the giving of such an instruction has been held not to constitute reversible error. *Belskis v. Dering Coal Co.,* 246 Ill. 62, 69; *Krieger v. Aurora E. & C. R. Co.,* 242 Ill. 544.

The real issue was one of fact. Was the accumulation of gas distributed by defendant, in decedent's cistern, the cause of the explosion? The jury answered this question in the affirmative and we cannot say the verdict is manifestly contrary to the weight of the evidence.

The judgment is affirmed.

*Judgment affirmed.*

O'CONNOR, P. J., and MATCHETT, J., concur.