American National Bank & Trust Company, Administrator of the Estate of Anthony Peterson, Deceased, and Mabel Peterson, Plaintiffs-Appellees, v. Peoples Gas Light and Coke Company, a Corporation, J. & K. Wrecking Co., Inc., a Corporation, Chicago Land Clearance Commission, a Municipal Corporation, and Anna V. Skarphs, Defendants. J. & K. Wrecking Co., Inc., a Corporation, and Chicago Land Clearance Commission, a Municipal Corporation, Defendants-Appellants.

**Gen. No. 48,774.**

First District, First Division.

June 12, 1963.

Rehearing denied July 8, 1963.

166

Hinshaw, Culbertson, Moelmann & Hoban, of Chicago (John M. Moelmann, Oswell G. Treadway and Karl M. Tippet, of counsel), for J. & K. Wrecking Company, and Chicago Land Clearance Commission, defendants-appellants.

Cooney and Stenn, of Chicago (Robert J. Cooney and Irving Stenn, Jr., of counsel), for appellees.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

This is an action brought in the Circuit Court of Cook County by Mabel Peterson to recover damages for personal injuries and by American National Bank & Trust Company, administrator of the estate of Anthony Peterson, to recover damages for the wrongful death of Anthony, Mrs. Peterson's son. The injuries and death were caused by an explosion and fire resulting from a gas main leak. Named defendants were the Peoples Gas Light and Coke Company, owner of the gas main, the Chicago Land Clearance Commission, owner of the property at 2933 and 2937 South Michigan Avenue, J. & K. Wrecking Co., which was engaged in demolishing the buildings on the Commission's land, and Anna V. Skarphs, owner of the apartment building Mrs. Peterson and her son were visiting

---

* See Callaghan's Illinois Digest, same topic and section number.

167

when the explosion occurred. At the close of plaintiffs' case, the court directed a verdict for defendant Skarphs and no question is raised as to that ruling. After defendant Peoples Gas had rested, but before the case was submitted to the jury, it entered into a settlement agreement with plaintiffs whereby it paid Mrs. Peterson the sum of $120,000, and the administrator the sum of $10,000. The causes were then dismissed as to this defendant. At the close of all evidence, the Court refused the remaining defendants' requests for directed verdicts and the jury returned verdicts finding both guilty. Damages were assessed at $30,000 for Mrs. Peterson and $20,000 for the administrator. The usual post trial motions were denied and defendants appeal * from the judgments entered on the above mentioned verdicts.

On March 10, 1959, around 3:00 p. m., Mrs. Peterson and her son visited her friend Mrs. Brown at the latter's basement apartment at 2929 South Michigan Avenue. As Mrs. Peterson entered the apartment she said she smelled gas and noticed two gas men leaving the apartment. About fifteen minutes later, while the occupants of the apartment were watching television, an explosion occurred, setting the apartment on fire and Mrs. Peterson and Anthony were severely burned. Anthony died five days later.

The events leading to the explosion and fire are as follows. The Commission had acquired the properties at 2933 and 2937 and contracted with J. & K. for the wrecking of the buildings located on the property (two and two and one-half story dwellings). On December 29, 1958, the Commission notified Peoples Gas that the two buildings were vacant and being readied for wrecking and that the gas service should

---

* Only one set of briefs was filed on this appeal by the two defendants. No distinction is made between the liability of either defendant.

168

be shut off beyond the building line. Gas service to the building at 2933 was via a twenty-inch pipe laid underground slightly to the west of the center line of Michigan Avenue. From the twenty-inch pipe a one and one-quarter inch copper pipe, encased in a protective one and one-half inch steel pipe carried gas to the building. These pipes entered the basement of the building at 2933 about one foot above the basement wall and protruded about six inches from the wall. A transit sleeve encased the gas pipe where it passed through the basement wall thereby protecting the pipe from the wall's weight.

On January 1, 1959, a Peoples Gas service man went to the building at 2933 and locked off the gas meter in the basement. The following day this employee returned with a coemployee and the two of them removed the meter and five foot stand pipe. This left the service pipe protruding six inches from the wall capped with a "T" pipe. These employees had with them a directive from the company to "cut off service at the front wall, get the Street Department to cut off at the main." Later in January, another employee of the gas company went to the building and removed the "T" and inserted what is designated a "Griffith stopper," a temporary cutoff. The "Griffith stopper" was inserted twelve feet into the service pipe by means of two six feet extension rods. This was the last work done on the gas lines in this area until the day of the explosion. When the explosion occurred, the gas service had not been cut off at the main.

After signing the contract with the Commission, J. & K. commenced wrecking operations some time in February, demolishing the building at 2937 first. At the time of the explosion, only a portion of the north wall at 2933 remained standing. This wall was adjacent to the building at 2929. A tractor was used

to load the truck with scrap and rubble, to level the area, and to tear down portions of walls, by means of a cable but most of the demolition work was done by hand.

The following is a brief summary of the events on the day of the explosion. At 9:00 a. m., a Miss Clayton, who lived at 2929, left her apartment and noticed the tractor was operating at 2933. She did not smell any gas. About the same time, James Craig, an inspector for the Commission, arrived to check on the progress of the demolition. He also noticed the tractor in operation but did not smell any gas. Edward Kopaz, son of J. & K.'s president, testified that he had arrived at the 2933 site around 8:30 a. m. and while walking around the area, he noticed an odor of gas. He could not state the time when the odor first became apparent. He did nothing until Mr. Velco, J. & K.'s secretary, arrived around 10:00 a. m. Velco ascertained that the odor was gas and he went to a nearby filling station to call the gas company and inform them of the odor. Velco stated he placed the call at 10:30, but the operator who received the call said it was not made until 12:00 noon.

After receiving the call from Velco, the gas company operator notified a Mr. Tash, a special service man who investigates gas leaks. Tash said he received the call at 12:15 and arrived at 2933 at 12:35. He confirmed that the odor was that of gas escaping from one of his company's lines and he contacted a work gang in order to dig up Michigan Avenue and cut off the gas at the main. All parties agreed that the odor of gas emanated from the northwest corner of the lot at 2933, about twenty feet from the building at 2929. Tash testified that he saw the wrecking company employees and that the tractor was in operation, pulling concrete with a chain.

170

When Michael McDonagh, foreman of the work gang, arrived at 1:15, he had with him an M-scope, which is used to trace underground metals. He was able to locate the service pipe with the M-scope, but lost the trace when he tried to follow it away from the main underneath Michigan Avenue. Although there is some conflicting evidence, it appears that the service line leading to the building at 2933 (which had been plugged with the "Griffith stopper" by the gas company) had been dislodged and that this was the source of the gas leak.

After the work gang secured a compressor they commenced digging up Michigan Avenue. This was around 2:00 p. m. Before they were able to effect a cutoff, the explosion occurred. This was between 3:00 and 3:15.

Defendants contend the trial judge should have allowed either their motion for a directed verdict or for judgment notwithstanding the verdict. Defendants request that the judgments entered below be reversed and judgments in their favor be entered here, or that the cause be remanded to the trial court with directions to enter judgments in their favor, or that a new trial be granted.

In considering the questions relating to the motions for directed verdicts at the close of all the evidence and for judgments notwithstanding the verdict, the court must consider the evidence with all reasonable inferences arising therefrom in favor of plaintiff. Gray v. Terminal R. Ass'n of St. Louis, 37 Ill App2d 376, 185 NE2d 700. The sole question on this appeal is whether there is any evidence, which, taken in its aspects most favorable to the plaintiffs, proved or tended to prove the cause of action. Moss v. Wagner, 27 Ill2d 551, 190 NE2d 305.

With these rules in mind, we will summarize the salient pertinent evidence most favorable to plaintiffs. Before the demolition work commenced, the gas company removed the gas meter from the building at 2933 and inserted a temporary stopper in the service line although customary procedure was to cut the gas off at the main when a building was to be demolished. The stopper was of a type used during cold months when the ground is hard. When warmer weather arrives, the cutoff is made at the main. Even though it was temporary, there is no evidence that the stopper used did not effectively seal off the pipe. The gas company did no further work until the day of the accident. After the gas company stopped up the service line there remained but six inches of pipe protruding from the basement wall. This pipe could not be dislodged by hand, but rather, required use of heavy machinery or a heavy truck. The only party having the necessary equipment or truck at the site was defendant J. & K. The pipe was dislodged, resulting in a gas leak.* This in turn caused the explosion and fire.

■ Defendants contend that they had no authority to sever the gas service pipe at the gas main and therefore no duty to do so. They admit that "there is testimony that on the day of the occurrence that part of the service pipe which had extended from beneath the sidewalk at 2933 had been removed." They argue that when or by whom it was removed, the record is silent. Plaintiffs contend, and we agree, that there are sufficient facts and circumstances to support an inference that defendant J. & K. dislodged the service pipe either by accident or by design.

---

* Gas service to the building at 2929 was from a main in the alley behind the building. There is no doubt that the gas which caused the explosion emanated from the service line at 2933.

172

Defendants rely upon Kelley v. Public Service Co. of Northern Ill., 300 Ill App 354, 362, 21 NE2d 43, and other cases which hold that, "[a] theory cannot be said to be established by circumstantial evidence unless the facts are of such nature and so related as to make it the only conclusion that could reasonably be drawn." Defendants then assert, rightly, that inferences that persons other than defendants dislodged the service pipe and caused the gas leak could reasonably be drawn from the facts adduced at trial. This is true. However, it is for the jury to determine which inference it will draw from circumstantial evidence. Cardona v. Toczydlowski, 35 Ill App2d 11, 180 NE2d 709.

Moreover, cases decided by the Supreme Court since the Keeley decision have recognized that facts may support more than one inference and the jury, in determining liability, is allowed to draw inferences judges do not feel are the most reasonable. In Lindroth v. Walgreen Co., 407 Ill 121, 94 NE2d 847, a mother purchased a vaporizer and while it was in use in her child's room, a fire started causing severe burns to the fourteen-month-old child. Suit was then brought against the manufacturer and seller of the vaporizer, alleging that the vaporizer was defective and that the defect caused the fire. Although there were no eyewitnesses to the fire (other than the fourteen-month-old child), the jury returned a verdict in favor of plaintiff and the Supreme Court affirmed the judgment. In Lindroth, as here, defendants argued strenuously that there were no eyewitnesses to the occurrence and no direct evidence of negligence on their part, and that the fire could have resulted from other causes. The Supreme Court answered this argument by stating:

173

There is considerable argument over evidence in the record tending to show that the fire might have been caused by other agencies than the vaporizer. This court, of course, on the contention here in issue, is not concerned with the weight of the credibility of the evidence, but only with the narrow question whether there is any evidence, together with all reasonable inferences to be drawn therefrom, which would justify submission of the case to the jury. . . . The key point of the controversy, is appellants' contention that the fact of defect must be proved before it may be inferred that such defect caused the fire and the injury complained of. There being no eyewitnesses, the determination of this contention must be found in the circumstances revealed by the evidence, if at all. . . . The inquiry here is whether the result reached below was one which is reasonable on the facts in evidence, not whether other conclusions might also have been reached. 407 Ill at 130, 131, 134.

The Supreme Court then quoted with approval the following language from Lavender v. Kurn, 327 US 645:

Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear.

The facts and circumstances here constitute a reasonable basis for the jury's conclusion that the defendants removed the service pipe and that this

174

proximately cause the explosion and fire. This conclusion was apparently more probable to the jury than that the pipe may have been removed by some imaginary person without any heavy equipment. If, as in Lindroth, the jury can infer that the product was defective and that the defect caused the fire, then the jury here was warranted in inferring that defendants dislodged the service line and thereby caused the leak which resulted in the explosion and fire.

Defendants point out that while J. & K. was entitled to all scrap material at the site, this did not include the gas pipe. The fact that defendants were not entitled to remove the gas pipe does not prevent the jury from inferring that it was more probable and reasonable that J. & K. did in fact remove the pipe. Hocker v. O'Klock, 16 Ill2d 414, 158 NE2d 7.

██ The main contention of defendants is that the sole proximate cause of the explosion was the failure of the gas company to shut off the service at the gas main. It is the theory of plaintiffs that but for the concurrent negligence of the defendants, the explosion would not have occurred. Where the concurrent negligence of two parties causes an injury which would have been avoided but for the negligence of either, the negligence of each is the proximate cause. Gleason v. Cunningham, 316 Ill App 286, 44 NE2d 940. What factors constitute the proximate cause or causes of an injury is ordinarily a question of fact to be determined by the jury from all the attending circumstances. Ney v. Yellow Cab Co., 2 Ill2d 74, 117 NE2d 74.

██ Accepting the contention that the gas company was negligent in only inserting the temporary stopper without cutting off service at the main, does it follow that other defendants are relieved of liability? We believe not. As stated before, the evidence supports a

175

finding that the temporary stopper would have permitted the building at 2933 to be razed without resulting in the gas leak and explosion if the service pipe had not been dislodged. At least the jury so found and we cannot say a contrary result is clearly evident from the facts.

Defendants next contend that they were irreparably prejudiced by the admission of improper and irrelevant evidence. Over objections by defendants, the court allowed plaintiffs' counsel to read to the jury portions of the contract between the Commission and the wrecking company. The portions read concerned furnishing a watchman at the site during nonworking hours, prohibiting burning of debris at the site, stripping authorization, and responsibility for ascertaining that utilities were shut off. Defendants assert that neither of them is complaining of any breach and there is lack of privity between them and plaintiffs. The contract terms admitted in evidence is contended to be a personal matter between them. But George Burridge, an employee of the Commission, testified that, "[t]he purpose of the watchman [on projects of this nature] is to protect the public." In Watts v. Bacon & Van Buskirk Glass Co., Inc., 20 Ill App2d 164, 155 NE2d 333, plaintiffs, members of the general public, were allowed to introduce in evidence the specifications of the architect in their action against the defendant storeowners. The specifications called for use of tempered glass and plaintiffs were injured when the plate glass used shattered. Defendants' contention with regard to the watchman can be compared to their earlier contention that the service pipe may have been removed by a trespasser.

■ The contract provision concerning utility services provides that, "prior to the starting of work or removal of each building under the contract, the Contractor will be responsible for checking all utili-

ties, including . . . gas service . . . to see that they have been cut off in strict accordance with the respective requirements and regulations of the City of Chicago, the Commission and the utility companies involved." Yet, as noted before, the only contact with the gas company by defendants before the leak occurred was the December notice by the Commission. It would appear obvious that this provision of the contract was inserted to prevent the type of incident that actually occurred in the instant case. We can only conclude that the terms of the contract admitted in evidence were considered by the trial court as relevant and to be considered by the jury. The trial judge made no error in making this determination. See 32 CJS, Evidence, secs 676, 677, 732.

██ Defendants also assert that Mabel Peterson failed to properly prove the hospital charges for which she sought recovery. The rule in Illinois is that claimant must prove two things to recover for medical and surgical services. First, plaintiff must prove that he has paid or become liable to pay the amount claimed. Second, plaintiff must prove that the charges are reasonable. Wicks v. Cuneo-Henneberry, 319 Ill 344, 150 NE 276. Plaintiffs called Richard Butler, assistant credit manager at Michael Reese Hospital, who testified that Mrs. Peterson had incurred a debt of $8,672.45 for hospital services and that a physician's bill of $4,200 had been rendered and assigned to the hospital. He further stated that he was familiar with the usual and customary charges for services of this nature and that the charges in the instant case were reasonable. Plaintiff also called Dr. Leonard Bressler and Ulysses A. Buggs, Jr., a physical therapist, both of whom had treated Mrs. Peterson. None of the testimony given by these persons was contradicted and we believe it satisfied the requirements set forth in Wicks.

█ █ The next question is whether it was sufficiently proved that Anthony died as a result of defendants' negligence. Plaintiffs' testimony was that Anthony was in good health prior to the explosion, that Anthony sustained severe burns as a result of the explosion, that he suffered from no other injury or disease, and that he died five days after the explosion and fire. Plaintiffs also introduced the coroner's protocol of Dr. Wagner, a coroner's pathologist. At the time of the trial Dr. Wagner was out of state and the protocol was identified by the doctor's secretary. The portion of the protocol read to the jury was the doctor's statement that based on the autopsy performed, "[i]t is my opinion the said Anthony Peterson's death was caused by early bronchial pneumonia due to second and third degree burns." The fact that this protocol was a public record was not sufficient to make it competent without the testimony of the pathologist who performed the autopsy. See sec 18 of the Coroner's Act, Ill Rev Stats, c 31, § 19. However, we conclude that the proximate cause of death was sufficiently proved to be due to the burns suffered by reason of the fire without use of the protocol. Therefore, no reversible error was committed by admitting the protocol in evidence.

█ While being examined by counsel for the gas company, Robert Parr, an employee of the gas company, was asked, "has any claims ever been made against the Peoples Gas Light and Coke Company arising out of the use of a Griffith stopper?" Parr answered, "[n]o sir, not to my knowledge." Accepting defendants' contention that this was error,* we cannot perceive how it was material, given subsequent events at trial. The above exchange could only tend to exonerate the gas company, perhaps to the detriment of the other defendants. However, once the gas

---

* Plaintiffs' counsel joined in the objection to the question.

178

company effected a settlement with plaintiffs whereby it in essence admitted liability, any possible prejudicial effect was erased.

 This leads to the question of whether defendants were prejudiced by the settlement between plaintiffs and the gas company. As stated previously, at the close of all proofs, the gas company paid Mrs. Peterson $120,000 and Anthony's estate $10,000, and then was dismissed from the suit. An agreed instruction was then given the jury, informing it of the settlement, the amounts received and that the jury should take into consideration the amounts received should it find either or both defendants guilty. Even though they agreed to this instruction, defendants assert they were irreparably prejudiced by this action. They insist that the action below advised the jury that the settlement was insufficient to compensate plaintiffs for the damages sustained.

Defendants rely upon Consolidated Fireworks Co. v. Koehl, 190 Ill 145, 60 NE 87, and Clancy v. Richardson, 302 Ill App 99, 23 NE2d 399, but each of those cases involved entirely different situations and the holdings are in no way applicable here.

Koehl involved an action to recover damages resulting from an explosion of certain fireworks and joined as defendants were the city, the committee in charge, and the company which furnished the fireworks. The city was dismissed at the close of plaintiff's case and the court directed out the committee at the close of all proofs. The controlling question of fact in the case was whether the two individuals who negligently handled the fireworks were servants of the company or the committee. The Supreme Court reversed the trial court's action, holding that the dismissal of the committee decided a question of fact properly to be determined by the jury.

In Clancy plaintiff voluntarily dismissed three of four defendants at the close of her evidence. There

179

had been no settlement between these defendants and plaintiff. (At least none that the jury was informed of.) Since plaintiff had made a prima facie case of gross negligence against one of the defendants dismissed, the court felt the dismissal was prejudicial to the remaining defendant. The action left one defendant "holding the bag." Such was not the case here.

Defendants suggest that the course that should have been followed below was for plaintiffs and the gas company to have made their agreement binding on them, regardless of the verdicts returned by the jury, and then have submitted the case to the jury. Defendants cite no authority or precedent for such novel action by the trial court. The action actually taken in the instant case was considered and approved by the Appellate Court for the Second District in Aldridge v. Morris, 337 Ill App 369, 380, 86 NE2d 143.

The next point raised on this appeal concerns five instructions given the jury. The objections to the first two instructions (IPI Nos 1.03 and 20.01) rest on defendants' claim that there was no proof of negligence on their part. Since we have already held that the evidence does support a finding of negligence, the instructions, of course, were proper. The third instruction complained of is objected to since it did not include a charge that Mabel Peterson had the duty to prove she was in the exercise of due care for her own safety. This charge was given in two other instructions and, as stated in Goertz v. Chicago & N. W. Ry. Co., 19 Ill App2d 261, 270, 153 NE2d 486: "All the law pertinent to the issues in a case need not be stated in a single instruction." Further, defendants make no allegation that Mrs. Peterson failed to prove due care and the record is devoid of any indication that Mrs. Peterson failed to prove due care for her own safety.

Instruction 29 stated:

> It was the duty of the defendants, and each of them, before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff, Mabel Peterson and the decedent, Anthony Peterson.

Defendants contend that they had no knowledge of the presence of plaintiff or her son at 2929 and therefore the instruction is erroneous. If Mrs. Peterson and her son had been on the property at 2933 or 2937, then this objection possibly would have merit. However, Mrs. Peterson and Anthony were at a place they had a right to be and defendants' liability to persons at 2929 is not predicated on knowledge of the persons' presence. The last instruction objected to is also an IPI instruction (No 12.04) and there was no error committed by giving it to the jury.

The final questions on this appeal concern plaintiffs' counsel's closing argument to the jury and the amounts of the verdicts returned by the jury.

■ First, defendants object to the size of the verdict returned for the death of Anthony. The amount of the jury verdict coupled with the amount paid by the gas company in its settlement, bring the administrator's recovery to the statutory maximum for a death action, $30,000. (Ill Rev Stats, c 70, § 2.) There is general agreement that it is virtually impossible to place a value on human life yet we are to determine whether the jury placed an excessive value on the life in the instant case. Mrs. Peterson has four other children of tender years and was herself unemployed. Given these facts, we cannot say the jury was influenced by passion or prejudice in determining that Anthony's life was worth the statutory maximum.

■■■ This raises the question of Mrs. Peterson's recovery.* Mrs. Peterson was severely and horribly burned over most of her body, including her face, both arms, chest and both legs. She has undergone several operations, including skin grafts, and will have to undergo several more. Her injuries have resulted in greatly limiting the movement of her arms and she has disfiguring and disabling keloid formations over a good portion of her body. In an effort to regain mobility, she has had treatments of a painful nature. Most of her injuries are permanent. It is against this background that we must consider the adequacy or excessiveness of the damage award.

When the settlement with the gas company was reached, Mrs. Peterson received $120,000 as compensation for her injuries. The jury returned a verdict in the amount of $30,000 against the remaining two defendants, making the total recovery $150,000. Given the fact that Mrs. Peterson has and will continue to experience great pain as a result of her injuries, that her past and future medical expenses will total some $30,000, that she has sustained a loss of mobility in both arms and both legs, and, that she has sustained a disfigurement that will remain with her for the rest of her life, we do not believe the jury returned a verdict in an amount not warranted by the evidence. We recognize that no two persons or their injuries are identical, but a review of verdicts approved recently indicates that the instant award is no more than just compensation for the injuries sustained. There is nothing in the record to justify a conclusion that the jury's assessment of damages is against the manifest weight of the evidence. Hulke v. International Mfg. Co., 14 Ill App2d 5, 142 NE2d 717.

---

* Although defendants contend that the award is excessive, much of the testimony concerning the nature and extent of Mrs. Peterson's injuries was not abstracted by defendants as "not necessary to this appeal."

■ Defendants further object to the admission of a photograph of plaintiff's face taken while she was in the hospital. We have examined the photograph and do not feel it was of such a nature as to cause prejudice or inflame the jury's passion and the trial judge did not err in allowing it in evidence. Defendants' reliance on Vujovich v. Chicago Transit Authority, 6 Ill App2d 115, 126 NE2d 731, is misplaced since the photographs in that case were of passengers other than plaintiff.

■ Defendants' primary objection concerning damages is centered around the issue of how plaintiff's counsel argued the question of damages in his closing argument rather than the amount of the award. In the course of closing argument, counsel employed the use of a blackboard as an aid in computing damages. In addition to specifying an amount for each part of plaintiff's body injured (e. g., $10,000 for each burned leg, $20,000 for the burns on one arm and $15,000 for the burns on the other) and specifying the amount of past and future medical expenses recoverable, counsel made a "per diem" argument as to pain and suffering, both past and future.

Although it has long been held that counsel may place a total value on the pain and suffering sustained by his client (Graham v. Mattoon City Railway Co., 234 Ill 483, 84 NE 1070) the question of a "per diem" argument for pain and suffering was first presented to the Supreme Court in Caley v. Manicke, 24 Ill2d 390, 182 NE2d 206. The Appellate Court for the Second District, one justice dissenting, approved the use of a per diem argument (29 Ill App2d 323) but the Supreme Court, after examining the decisions of other jurisdictions, held that the argument employed by plaintiff's counsel was error.

■ As stated previously, plaintiff's counsel suggested a damage figure for each arm and leg injured by the explosion and fire. We feel this is permissible

183

as being within argument approved in Graham v. Mattoon City Ry. Co., 234 Ill 483, 84 NE 1070. Counsel then stated he thought it would be helpful in computing damages for pain and suffering to "break it down." He then stated to the jury the length of time plaintiff had spent in the hospital and how long she would have to continue going to the hospital, matters supported by evidence. Then, speaking of the days in the hospital, counsel asked the jury over defendants' objection, "[w]ould you say $10 a day is fair compensation per day?" Counsel then suggested that the damage award should be $301,612.95 but told the jury that his figure may be too high or too low and that they should "break it down bit by bit, injury by injury, hundred by hundred." Counsel's use of a "per diem" type argument was actually very limited, involving only a small portion of his entire argument on the question of damages. We feel it in no way approached the argument made in Caley (see 29 Ill App2d at 332–335). In Caley, after making the "per diem" argument, plaintiff's counsel then threw the gauntlet at his opponent's feet, by saying to the jury:

> We have suggested to you and tried to show to you that a logical verdict and a fair verdict in this case would be fifty thousand one hundred and forty dollars and ninety cents. And I ask counsel to go ahead and show to you something else, if he can show it.

Counsel in the instant case was confronted with no such challenge. When defendants' counsel reached the question of damages during his closing argument, he employed the argument that the settlement paid by the gas company, $120,000, more than adequately compensated plaintiff for her injuries and improperly told the jury that plaintiff could invest the sum at five per cent interest and receive $6,000 per year which would accommodate her for life and leave the

184

principal intact. In Allendorf v. Elgin, J. & E. Ry. Co., 8 Ill2d 164, 133 NE2d 288 (an F.E.L.A. death action in which the jury returned a verdict for $127,-500) plaintiff called an actuary who used specific figures and specific rates of interest. Defendant objected to this, contending "that by the actuary predicating his ultimate results upon a specific sum . . . for [a] definite period . . . it was tantamount to adding probative value to these figures, thus invading the province of the jury." The Supreme Court agreed with defendant that this was error but refused to disturb the award, stating that the "ultimate question, of course, is not whether the trial was scrupulously free from error, but whether any error which occurred operated to the prejudice of the defendant. It is our opinion that the result in this case would have been no different even had the actuary employed neutral figures in her testimony."

Although the "per diem" argument used in the instant case was improper, the formula method employed does not remotely resemble the meticulous, comprehensive "per diem" argument used in Caley, and we do not feel it to be reversible error. As the Supreme Court stated in Caley, "obviously all methods and means which the ingenuity of counsel may produce for the purpose of illustrating an otherwise proper argument cannot be considered at this time." The total recovery by Mrs. Peterson is considerably less than the amount counsel requested.

Rather than being confused by plaintiff's counsel's "per diem" argument, we think that the jury, having first determined that defendants were liable, considered the persuasive though improper argument of defense counsel and then determined the award. Since Mrs. Peterson has made no objection, we can only affirm the verdict.

We conclude, therefore, that the evidence does support a finding that defendants were negligent and

185

since no reversible error occurred at trial, the judgments are affirmed.

Affirmed.

MURPHY, J, concurs.

ENGLISH, J, dissenting:

In recent years the trials of personal injury suits in Illinois were frequently punctuated by strong and, often, heated objections to the use by plaintiffs' attorneys of what came to be known as the "per diem formula" in argument to the jury on the question of damages for pain and suffering. The plaintiffs' attorneys were equally intent on using the argument as it was a polemic tool of very considerable value, starting, as it would, with a rate of damages per hour or per day which would seem very small, and concluding with a large sum through multiplication by the number of time units elapsed from the injury to the date of trial, and further for the period of the plaintiff's life expectancy.

Among trial court judges there were marked differences of opinion as to the propriety and legality of such an argument, and there was no governing Illinois authority. Pennsylvania had long been alone in prohibiting use of the argument, but after the New Jersey Supreme Court took the same position in Botta v. Brunner, 26 NJ 82, 138 A2d 713 (1958), the reviewing courts of many states began in quick succession to line up on one side or the other.

Appellate Courts in Illinois reached divergent conclusions, and the Appellate Court for the Second District itself divided on the subject in Caley v. Manicke, 29 Ill App2d 323, 173 NE2d 209, the majority opinion permitting use of the argument. That court, however, determined that the question justified granting leave to appeal to the Supreme Court with a certificate of importance.

186

Upon further review, the Supreme Court also recognized the profound effect its decision would have in this area of trial practice, when it stated at the outset of its opinion:

> The important question presented for determination is whether the scope of proper jury argument permits the use of a mathematical formula from which counsel may argue that his client should be awarded a specific sum per day, or other fixed unit of time, for pain and suffering. (Caley v. Manicke, 24 Ill2d 390, 391, 182 NE2d 206.)

Finding no error in several other points presented, the Supreme Court reversed and remanded for a new trial on the sole ground that the use of the per diem formula "transcends the bounds of proper argument." This conclusion was fortified by the court at the same filing when, referring again to a per diem argument, it said in Jensen v. Elgin, J. & E. Ry. Co., 24 Ill2d 383, 387, 182 NE2d 211:

> This issue, together with the same arguments as are here advanced, were presented to us in Caley v. Manicke, post, p 390, where we hold that *it was reversible error to permit counsel to use this sort of a mathematical formula in his argument to the jury.* Our decision in that case is controlling here. (Emphasis supplied.)

It is difficult for me to conceive of any stronger language than this to indicate an unequivocal adjudication that use of the per diem argument is not to be countenanced and failure to sustain objection to its use will constitute reversible error. Thus, I should have thought, the confusion in the trial courts on this subject was laid to rest once and for all. Now, however, with the filing of this opinion we restore the confusion. The Supreme Court said "it was reversible

error." The majority here say "we do not feel it to be reversible error."

Another division of this court (whose opinion had been reversed in the Jensen case) recently characterized the Supreme Court's Caley decision by stating that "[i]n the Caley case *the court squarely held that it was reversible error* to permit plaintiff's counsel to use this type of argument to the jury." (Millsap v. Central Wisconsin Motor Transp. Co., 41 Ill App2d 1, 189 NE2d 793, 798.)

The Supreme Court itself said that the Caley decision was controlling of its own determination of the Jensen case. I think we commit error in not reaching the same conclusion here. We attempt to exercise a discretion where none exists. As stated by the Supreme Court in Agriculture Transp. Ass'n v. Carpentier, 2 Ill2d 19, 27, 116 NE2d 863:

> Where the Supreme Court has declared the law on any point, it alone can overrule and modify its previous opinion, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases.

That the type of argument used in the case at bar and in Caley and Jensen were similar there can be no doubt. In commenting on the per diem argument in this case, the majority say that it "was actually very limited, involving only a small portion of his entire argument on the question of damages," and that it did "not remotely resemble the meticulous, comprehensive 'per diem' argument used in Caley." I say that it was meticulous and comprehensive and that it was the very heart of plaintiff's damages argument. It should be pointed out, however, that the opinions in Caley and Jensen make it clear that they rest not on what portion of the jury argument is devoted to the per diem formula, or on how meticu-

188

lously it is presented, but only on the fact of its being argued at all.

The Appellate Court opinion in Caley sets forth the chart made by plaintiff's attorney in closing argument, in which seven items were listed with amounts after each, totalling $50,140.90. (29 Ill App2d 323, 333.) Three of the items were for pain and suffering and totalled $25,540, or approximately half of the total amount requested. These items were:

| | |
|---|---|
| 11,680 hours (for the first 2 years, 18 hours per day @ $1 per hour) | $11,680.00 |
| 510 days (for the remaining time to date of trial @ $10 per day) | 5,100.00 |
| Future (for expectancy of 24.52 years @ $1 per day) | 8,760.00 |
| | $25,540.00 |

In the case at bar a similar chart was made by counsel on a blackboard which was not preserved in the record, but the figures can be reconstructed from the argument. About the same number of items were used, including three for pain and suffering, on a per diem formula. These items were:

| | |
|---|---|
| 268 days (in the hospital @ $100 per day) | $26,800.00 |
| 5 years (in and out of the hospital in the future @ $10 per day) | 18,250.00 |
| Future (for expectancy of 43.7 years @ $10 per day) | 159,505.00 |
| | $204,555.00 * |

* This amount demonstrates what the Supreme Court was referring to when it said in Caley that such figures produce "an illusion of certainty."

Other items for the nature and extent of the injuries (totalling $65,000), hospital and medical bills ($13,257.95), and future hospital and medical bills (estimated by the doctor @ $18,800) came to $97,057.-95. Thus, the grand total requested of the jury was $301,612.95, of which the per diem formula items constituted more than two-thirds (as compared with one-half in Caley).

I believe that the figures shown above indicate that the arguments used here and in Caley are of the same type. The manner of presentation to the jury in the instant case also is a classic example of the per diem formula argument. I quote only a portion to demonstrate: *

> Now we know she has a life expectancy of 43.70 years. 43.70 years to look this way, going into the world and having people stare at her, to have people shy away from her, to neglect her. Walk down the street with her once and see what happens, and she may get worse according to the doctor. Would you say because of that injury, because of that injury and that humiliation and that pain and suffering for the rest of her life, would you say that $10 a day would compensate her, would begin to compensate her, just $10 a day for that phase of her injury. His Honor will tell you you can take that into consideration. If you say $10 a day is fair, there's 365 days a year and for one year of being looked at and shied away from and humiliated, that comes to $3,650, and for 43 years it is $159,505, and I figured out, and if my mathematics aren't proper you correct me, but this starts to tell you, give you an idea of what the figure is, what the amount is, and that total is $301,612.95.

---

* The entire per diem argument was made after timely objection thereto had been overruled.

One gets from the majority opinion five other reasons or inferences as to why the Caley rule should not be applied in this case: (1) the damages awarded were not excessive, (2) the jury appears not to have been prejudiced by the argument when the amount awarded is compared with the amount requested,* (3) the record justifies the verdict, (4) defendant's counsel also made an improper argument as to damages, and (5) plaintiff's attorney did not throw down the gauntlet or challenge defense counsel as he did in Caley.

I believe none of these is tenable.

(1) In Caley the defendant made no claim that the verdict was excessive.

(2), (3) The dissenting justice in Caley set forth these positions very ably, but they were not persuasive to the other six members of the court.

(4) The court in Caley anticipated the basic idea contained in this point when it said: "Nor would the fact that opposing counsel could use his own formula and figures remedy the situation because this would only emphasize the improper argument and would further mislead the jury into relying on the formulae and figures rather than the actual evidence of damages." (Page 393.)

(5) I consider the gauntlet point to be of no consequence.

There are other matters in the majority opinion with which I am not in agreement, but I shall not enumerate them, as I believe the Caley decision, standing alone, controls this case and requires the granting of a new trial.

---

* The verdict in Caley was approximately 40% of the amount requested. In the case at bar it was approximately 50%.